IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION


ALLEN BISHOP                                             PLAINTIFF


VS.                        CASE NO. 07-CV-4060


TYSON FOODS, INC.                                        DEFENDANT


**<u>MEMORANDUM OPINION</u>**


Before the Court is Defendant's Motion for Summary Judgment.  (Doc. No. 49).  The

Plaintiff has filed a response to the motion.  (Doc. No. 52).  The Court finds the matter ripe for

consideration.


<u>BACKGROUND</u>[1]

Tyson Foods, Inc. ("Tyson") owns  and operates a fully integrated poultry processing

complex in Nashville, Arkansas, where it hatches, raises, and processes chickens.  After

hatching, the chicks are transported to local chicken houses where they are raised to processing

weight.  When the chickens reach the desired weight, Tyson sends a crew of catchers to the

chicken houses to catch the birds, load them into cages, and transport them to the plant in

Nashville for processing.

On September 12, 2005, Allen Bishop, an African-American male, was hired by Tyson as

a chicken catcher at its Nashville complex.  Bishop worked for Tyson until he resigned on

---

[1] The background in this case is lengthy.  However, this is necessary in order to recite the
large number of discriminatory acts Bishop has alleged against the Defendant, Tyson
Foods, Inc.

August 8, 2007.  Initially, Bishop was assigned to the "D" catching crew.  After a few days, he transferred to the "E" crew where he worked until his resignation.

While on the "E" crew, Bishop worked with Everett Ferguson, the crew supervisor, John Dellinger, the lead man, four chicken catchers (including Bishop), a forklift driver and several truck drivers who transported the catching equipment to the chicken houses and hauled the caged birds back to the plant for processing.  The crew was transported to and from the chicken farms in a Tyson-owned truck.  When the crew arrived at a farm, they would catch the chickens using a large, self-propelled catching machine.  This machine would be driven slowly down the center of each chicken house while its long arm would swing back and forth across the width of the house drawing the chickens onto the machine's conveyor belt.  The chickens would then move up the conveyor belt to the rear of the machine where two catchers were waiting to direct the birds into large metal cages mounted on the machine.  Each metal cage had fifteen separate compartments into which the catchers would load approximately fifteen chickens.

Each crew member had specific duties to perform depending on where they were positioned on or around the catching machine.  John Dellinger, the lead man, operated the machine's catch arm by using a hand-held controller.  One catcher walked on the floor of the chicken house on each side of the catching machine.  These two floor catchers "stirred" the birds up so they could be caught by the machine's catch arm.   They also collected any stray birds the catch arm missed.  The other two catchers rode on the rear of the catching machine or packer where they loaded the chickens from the machine's conveyor belt into the large metal cage's various compartments.  These jobs were assigned to the four catchers on a rotating basis so they would shift their positions on and around the catching machine throughout their shift.

The catcher assigned to the floor position on the right side of the catching machine was also expected to give breaks to the other catchers and to "count cages."  The job of counting cages entailed selecting one large metal cage from each truckload and counting the number of birds loaded into three of the cage's compartments.  This count would ensure that the cages were not overloaded.  The catcher who was assigned this job used  a "catch hook" to pull the chickens out of each compartment so he could get an accurate bird count.  However, some times the "catch hook" was not used by the catcher because his arm was long enough to reach to the back of the compartment and pull the birds out to count them.

Several weeks after being assigned to "E" crew, Bishop claims that two truck drivers, Lee Wofford and Robert Walker, showed him and Ronnell Riggins, another African American catcher on "E" crew, a string that Walker had tied into a hanging noose.  Riggins asked Walker where he learned to tie a noose like that.  Bishop claims that before Walker could answer, Lee Wofford said to Riggins "all 'rednecks' know how to make hanging nooses."  Wofford then showed them a tattoo on his arm of a wizard and said it was a "Klan" tattoo.  At this point, Bishop claims he walked away from the conversation.[2]

The next day Bishop went to the office to report the incident to Paul Britt or Kenneth Young, the Complex Human Resources Manager.  When he arrived, Paul Britt was in a meeting and Kenneth Young was out of the office.  Because neither man was available, Bishop reported

---

[2] Robert Walker, Lee Wofford and Ronnell Riggins' versions of this conversation are quite different than Bishop's.  However, at this stage of the proceedings, the Court must view the evidence in the light most favorable to the nonmoving party.  Therefore, the Court will view Bishop's version of the conversation as an accurate rendition of what transpired between the men.

the incident to Benjamin Timmons.[3]  During his meeting with Timmons, Bishop also complained that he was having to run the packer (ride on the catching machine and load the chickens into the large metal cages) longer than the other catchers.

After this meeting with Bishop, Timmons discussed the incident with Everett Ferguson, "E" crew's supervisor, and Don Mason, the Live Haul Manager.  Timmons asked both men to look into the matter and to tell the men to refrain from using the terms "redneck" and/or "Klan." Timmons also asked Ferguson to check into Bishop's complaint about running the packer without a break.  Ferguson told Timmons that he would talk to John Dellinger, the crew's lead man, about this and make sure it did not happen again.

After the meeting with Timmons, Don Mason talked to Lee Wofford about the tattoo and the "Klan" remark.  Wofford told Mason that someone on the crew had asked him about his tattoo and he told him it was a wizard.  Ronnell Riggins then asked Wofford if that meant he was a wizard in the "KKK."  Wofford told him no, he had gotten the tattoo when he was a teenager and was drunk.  Thereafter, Mason met with the entire crew and told them not to use the terms "redneck" or "Klan" as they offended Bishop.  The crew said they were just joking among themselves and did not mean to offend Bishop.  They said that they would not joke about these topics again.

Thereafter, Everett Ferguson talked to Bishop about the incident and his complaint regarding running the packer without a break.  Ferguson told Bishop that Tyson would not tolerate such behavior.  Everyone would be treated equally.  Ferguson also told Bishop that from

---

[3]  Benjamin Timmons supervised Don Mason, the Live Haul Supervisor.  Don Mason, in turn, supervised Everett Ferguson, the supervisor of "E" crew.

then on everyone would take breaks at ½ house and take their lunch break between houses.  If Bishop needed a break, he needed to speak up.  After these meetings, both Mason and Ferguson felt that the matters were resolved and reported such to Timmons.

After his meeting with Timmons in late September or early October, Bishop admits that he never again saw a hanging noose and no one ever again mentioned the "Klan"  or the "KKK." However, he does claim that the other crew members continued to make "redneck" comments about themselves.  In support of this claim, Bishop states that one time the crew needed a knife to cut a rope.  They asked around to see if anyone had a pocketknife.  The only person who had one was Ronnell Riggins.  After Riggins gave John Dellinger the knife, John said, "all of us 'rednecks' in the chicken houses, Big Orange[4] is the one that had the knife."   Bishop also claims that Dellinger sometimes wore a tee shirt that said something about rednecks liking to hunt and fish.  Bishop states that he was offended by these events.  Bishop states that at some point the "redneck" comments stopped.  He is not sure when, but he is sure that they stopped before he resigned in August 2007.

In October 2005, Bishop claims that a group of five crew members wore Confederate flag bandannas to work one day.  He complained to Benjamin Timmons about the incident.  About a month later, the group wore Confederate flag headbands to work.  Bishop again complained to Timmons.  After this second complaint, Bishop states that the group never again wore the bandannas or the headbands to work.  He does claim, however, that after December 2005, John Dellinger and Shane Sherrin, a catcher on "E" crew, would occasionally wear a Confederate flag bandanna to work.  He complained about this conduct in a meeting with Kenneth Young and

---

[4] Ronnell Riggins' nickname was Big Orange.

Don Mason in August 2006.  Bishop claims that Young responded to his complaint by saying, "Black people wear offensive clothing as well, like those N.A.A.C.P. tee shirts."  Young denies making this statement.  After this August meeting, neither Dellinger nor Sherrin ever wore any clothing depicting the Confederate flag again.

In late 2005 and early 2006, Bishop claims that on three or four occasions he missed his lunch break and yet was docked 30 minutes of time as if he had taken the break.[5]  He claims that he reported these incidents to Don Mason.

On January 26, 2006,  Bishop wrote a formal complaint letter to Paul Britt regarding his missed lunch breaks.  In this letter, Bishop also reiterated his previous complaints about the "Klan" and "redneck" comments made by his co-workers.[6]  At the end of the letter, Bishop stated that he intended to take his complaints to the Wage and Hour Division of the Labor Board and the EEOC.

On January 27, 2006, Kenneth Young and Don Mason met with Bishop regarding his various  complaints.  During this meeting, Bishop claimed that he missed his lunch break on several occasions and his work time had been docked 30 minutes each time.  He claimed that Matthew Woodall, a Caucasian catcher on "E" crew, used the "N" word in his presence.  He also

---

[5] During this time, individual crew members would take their breaks while the other crew members continued working.  Thirty (30) minutes would automatically be deducted from each crew member's work time for this break.  If they did not actually take a lunch break, they were instructed to write "no break" on their time card.  Bishop claims that he wrote "no break" on his time card 3 or 4 times but the 30 minutes was still deducted from his work time.

[6] Bishop made these complaints even though he admits that after he met with Benjamin Timmons in late September or early October, no crew member ever talked about the "Klan" or tied a hanging noose.

6

stated that he felt that Woodall had taken his safety glasses out of his bag.  Young told Bishop that his complaints would be investigated.  At this meeting, Young asked Bishop if the "redneck" and "Klan" comments had stopped.  Bishop told Young that no one had talked about the "Klan" since his meeting with Timmons in September or October 2005.[7]

In response to Bishop's complaints concerning his missed breaks, Don Mason began requiring all catch crew members to take mandatory lunch breaks between houses starting on February 6, 2006.  Thereafter, in March or April 2006, the company went to paid lunch breaks for all catch crew members.

In response to Bishop's complaints concerning Matthew Woodall's conduct, Don Mason investigated his alleged use of the "N" word in Bishop's presence and the theft of Bishop's safety glasses.  During the investigation, Mason discovered that Woodall had twice used the "N" word when referring to himself.  As a result, Woodall was given a written disciplinary warning for using inappropriate and offensive language.   There is no evidence that Woodall ever again used such language.  Also, in his investigation, Mason found no evidence supporting Bishop's claim that Woodall had taken his safety glasses from his bag.

Finally, a second investigation[8] was conducted into Bishop's complaint concerning the "redneck" and "Klan" comments that were previously made by crew members.  This time

---

[7]  In his January 30, 2006 notes regarding this meeting, Young wrote that he asked Bishop if the statements about "rednecks and Ku Klux Klan" were taken care of.  Young wrote that Bishop stated that after he talked to Timmons they stopped.  Bishop later states that the "redneck" comments had not stopped at this time.  However, there is no evidence that during this meeting Bishop told Young about any new or additional "redneck" comments being made by his co-workers.

[8] The first investigation of this complaint was conducted by Everett Ferguson and Don Mason in October or November 2005.

Kenneth Young  interviewed all "E" crew members on February 28, 2006.  During these interviews, several crew members admitted to making or hearing "redneck" comments at work but each stated that these comments were not racial and were never directed toward Bishop.  The only crew member who admitted making a "Klan" comment was Ronnell Riggins.  Riggins stated that he asked Lee Wofford in September or October 2005 if his wizard tattoo meant he was in the "Klan."  Young found no evidence of any "Klan"  comments being made by crew members after its initial investigation in October or November 2005.[9]

On February 9, 2006, Bishop complained that someone threw a chicken at him while he was sitting on the catching machine putting chickens in the cages.  Bishop believed that John Dellinger, the lead man, threw the chicken because it came from his side of the catching machine.  In response to this complaint, the other crew members were interviewed about the incident.  No crew member saw anyone throw a chicken at Bishop.  They believed that if a chicken flew by Bishop it was being tossed toward the cages on the catching machine, not at Bishop.

On February 17, 2006, Bishop filed a complaint alleging that someone went into his bag on February 15, 2006, and stole his tuna Subway sandwich.  He believed that it was Matthew Woodall, but had no proof.  An investigation was conducted by Kenneth Young and Don Mason on February 17, 2006.  During the investigation, all "E" crew members were interviewed.  No one knew anything about Bishop's missing sandwich.  Young also called the local Subway shop and asked the clerk if she remembered selling a tuna sandwich on February 15th.  She did not

---

[9] Bishop admits that after he complained to Benjamin Timmons in late September or early October 2005, no crew member ever made a "Klan" comment.

remember selling the sandwich nor did she remember seeing anyone fitting Bishop's description at the shop on that day.

Thereafter, on February 21, 2006, Bishop wrote a letter to Kenneth Young reiterating his complaint concerning his missing Subway sandwich.  He also complained that on the previous day, he had been accused by Everett Ferguson of putting 31 chickens in one of the cage compartments.[10]  Bishop stated in this letter that he was tired of making oral complaints to the company and it doing nothing about them.  He stated that he thought the company was "building a case" against him and that was a form of constructive discharge.  Later that day, Kenneth Young and Don Mason met with Bishop regarding his letter.  Young reassured Bishop that all his complaints were being investigated and that if someone was found guilty of any improper conduct that person would be disciplined.  Young and Mason also talked to Bishop about his complaint that he was falsely accused of overloading cages.  Bishop admitted that Ferguson had talked to the entire crew about the cage counts but stated that he felt Ferguson was talking about him in particular.  Thereafter, Young and Mason talked to the other crew members about the incident.  All the crew members said that Ferguson was talking to the entire crew.  None of the crew thought that Bishop was being singled out by Ferguson.  In fact, several crew members said that it was Shane Sherrin who was packing the cages heavy, not Bishop.

On March 11, 2006, Bishop wrote a letter to Kenneth Young.  In this letter, Bishop

---

[10] On February 20, 2006, Everett Ferguson talked to the entire crew about keeping an eye on their cage counts and not overloading them.  He stated that he knew that "E" crew had not had any overweight trailers but wanted to warn them that other crews were getting counseling statements because of this.  Afterwards, Bishop went up to Ferguson and told him that the other crew members were probably making up numbers on the cage counts because they hadn't been using the "catch hook" when counting.  Ferguson asked Bishop if he had seen crew members doing this and Bishop told him no.

informed Young that he had talked to Carolyn Box, the Assistant Complex Human Resources Manger, about removing 3 points from his record.[11]  Bishop had acquired these points when he took the whole day off work on three occasions to come into the office and report work related problems.

On March 14, 2006, Bishop wrote another letter to Kenneth Young.  In this letter, Bishop complained that John Dellinger had yelled at him.  Bishop said that this happened one night when the catching machine cut off.  Dellinger told Bishop to turn the machine off.  Before Bishop could do this, the power came back on and the machine started up again.  At that point, Dellinger yelled "turn the damn thing off."  Bishop also complained about not getting overtime on Saturday when it was "E" crew's turn to wash the catching machines.  He said that the last time it was "E" crew's turn to wash the machines, his lead man let another crew member wash instead of him.

On March 16, 2006, in response to these two letters, Kenneth Young and John Cebuhar met with Bishop.  In this meeting, Bishop was informed that all his prior complaints were being investigated by the company.  This did not seem to satisfy Bishop because neither Young nor Cebuhar could guarantee that a problem or incident would never happen again.  In regard to Bishop's request to have 3 points removed from his record, Young denied his request.  Bishop was told that taking off work to report work related problems was not an excused absence under the company's attendance policy.

---

[11] When a Tyson employee is absent from work, he will receive "attendance points" for the absence.  These points range from zero (0) to three (3) points depending on the reason for the absence and the amount of notification given to the company.  Attendance points are accumulated and remain on the employee's record for one (1) year.  An employee may be terminated if he receives fourteen (14) or more attendance points.

On March 18, 2006, Everett Ferguson talked to John Dellinger regarding his yelling at Bishop to "turn the damn thing off." Dellinger admitted that he did yell but stated that it was not at anyone in particular. He stated that he yelled because his hand was in the machine's "head" when it started back up. Dellinger was told to watch his language and try not to talk that way anymore.

Finally, on March 23, 2006, in response to Bishop's complaint that he was denied the chance to wash the catch machines and earn overtime on a Saturday, Bishop was offered the opportunity to wash the machines that upcoming Saturday. He declined the offer.

In May 2006, Bishop complained to Everett Ferguson and Don Mason that he had to count cages for four days in a row. Mason asked Bishop if he was counting cages all day and Bishop told him no, he only counted the first house. Bishop also complained that Shane Sherrin was getting to stay on the packer all day. Mason asked Bishop if he was having to do more work or work harder than anyone else. Bishop told him no. After this meeting, Ferguson talked to John Dellinger and told him that the jobs needed to be rotated more often. Dellinger was told that he needed to make sure that no one stayed on the packer all day and that the job of counting cages was rotated among the crew members. Bishop admits that for a short time everyone on the crew took their turn counting cages.

On August 2, 2006, Bishop wrote a letter to Benjamin Timmons complaining that he had to count cages two days in a row. He believed counting cages was a less desirable job and that the other crew members' conduct in not counting cages was racially motivated. In this letter, Bishop also reported that a new crew member, Brandon Deer, was making racial comments.

On August, 4, 2006, Kenneth Young and Don Mason met with Bishop to go over his

11

complaints.  In the meeting, Bishop told Young and Mason that one time in July, Deer had used

the phase "nigger-rig" in front of him.  Bishop did not report the incident, but another crew

member did.  Later that day, John Dellinger came to Bishop and told him that he had told Deer

that such language was not to be used.  Deer then came and apologized to Bishop for making the

comment.

On August 7, 2006, in response to Bishop's complaints, Young and Mason interviewed

the crew members.  It was determined that Deer had used the phrase "nigger-rig" on one

occasion.  As a result, he was given a written disciplinary warning for using inappropriate and

offensive language.  There is no evidence that Deer ever again used such language.  It was also

determined that Bishop's complaint regarding counting cages had no merit because all the crew

members have to count cages two days in a row from time to time, not just Bishop.

On November 10, 2006, Bishop wrote a letter to the new Live Haul Manager, Jeff

Westfall.  In this letter, he complained about a new crew member named Earl Hugle.  Bishop

claimed that Hugle, who was African American, had cursed at him on 3 occasions and threatened

("walked up on him") him once.  He claimed that John Dellinger had done nothing about this.

Bishop stated that if Hugle did it again he would respond accordingly.

On November 21, 2006, Carolyn Box investigated these complaints.  Box talked to both

Bishop and Hugle and then interviewed the entire crew.  It was determined that all the members

of "E" crew used profanity toward each other.  The crew members were reminded that such

language was not tolerated.  They were also reminded that they should not engage in any

arguments or confrontations.  After this meeting, the crew's work assignments were rearranged,

thus, limiting Hughle's contact with Bishop.  Bishop had no further problems with Hughle after

12

this.

On November 23, 2006, Bishop wrote Carolyn Box complaining about six incidents involving Everett Ferguson.  In his first complaint, Bishop stated that, a while ago,[12] Ferguson came to Bishop and told him to go into a chicken house and hang a curtain.  Bishop said he was eating his lunch at the time and the other crew members were just standing around.  When asked about the incident,[13] Ferguson said he did not recall it.  He stated that if someone did something wrong or needed to correct something that they had done, he would tell them that they needed to fix the problem.  If the person was eating his lunch, he would tell them they could do it after they finished.  He would not make anyone leave their lunch to go do something.

Next, Bishop complained that when he put in for his first vacation at Tyson, Ferguson told him that he needed to come to him and have his vacation approved before turning in his vacation request.  Bishop claimed that Eric Loyal, another crew member, did not have to clear his vacation with Ferguson first.  Bishop also claimed that after this incident, he filled out a vacation request without talking to Ferguson and nothing was said to him.  In investigating this complaint, Box discovered that all crew members were supposed to talk to a supervisor before filling out a vacation request.  This advance notice helped the supervisors make sure they had a full crew on any particular day.  Box also discovered that although Bishop and Eric Loyal did not talk to Ferguson on those occasions they took vacation, they did talk to other supervisors first.  Loyal

---

[12] When talking to Carolyn Box about this complaint, Bishop stated that he could not remember when this incident happened, but believed it happened about eight months earlier.

[13] On December 7, 2006, Box met with Ferguson and Bishop regarding Bishop's six complaints.

talked to Jeff Westfall and had his vacation request approved.  Bishop talked to Jeff Westfall and

Johnny Rosenbaum, another catch crew supervisor, and had his vacation approved.

Next, Bishop complained that on one occasion he asked Ferguson whether changing jobs

in the middle of a house was part of Ferguson's job schedule.  Bishop claims that Ferguson got

mad and would not answer his question.  He claims that Ferguson just kept asking Bishop if he

wanted to continue riding the packer (catching machine).  When asked about the incident,

Ferguson said that he had made the job schedule but had forgotten to tell the crew that in a 500

foot house they did not have to stay on the packer for the entire house unless they wanted to.

They could change jobs in the middle of the house.  Ferguson claims this is why he was asking

Bishop if he wanted to continue riding the packer.

Next, Bishop complained that in January or February 2006, Ferguson had jumped on him

for hanging curtains too high in a chicken house.  He claims that two weeks later, Ferguson hung

some curtains too high.  Bishop mentioned this to the lead man.  Thereafter, Ferguson jumped on

him for mentioning it to the lead man.  When asked about the incident, Ferguson said this

happened all on the same day.  He did tell Bishop to go rehang his curtains.  He then asked

Bishop if he was having a problem with the curtains after he heard that Bishop was complaining

about them to the lead man.

Next, Bishop complained that two weeks earlier Ferguson had brought him an attendance

form to sign.  When Bishop asked for a pen, Ferguson was rude.  Bishop said he had to find his

own pen to sign the form.  When asked about the incident, Ferguson said that he did give Bishop

an attendance form to sign but gave him his pen to use at the same time he gave him the form.

Finally, Bishop complained that one day he had a headache and was looking for an

14

aspirin. The lead man told him to ask Ferguson for one.  Bishop claims that when he asked Ferguson for an aspirin, Ferguson was rude to him and would not give him one, even though he had given aspirins to other crew members.  When asked about the incident, Ferguson said that in the past he had given aspirin to crew members but stopped when he found out he wasn't supposed to give out medicine.  Ferguson says he told Bishop this.  Box informed Bishop that this was company policy, the company nurse was the only person who could give out medication and aspirin was considered medication.

On November 27, 2006, Bishop filed a discrimination charge with the EEOC.  In this charge, Bishop claimed that he was being discriminated against because of his race in violation of Title VII.  He claimed that on October 9, 2006, a white co-worker refused to switch positions with him.  It happened again on October 16, 2006.  When it happened again on October 16th, his supervisor made the white co-worker switch off with him.  Bishop stated that he reported the incident to management but the conduct continued.

Two days later, Bishop wrote the EEOC to amend his charge.  In this letter, Bishop claimed that he had been discriminated against and subjected to a hostile work environment while working at Tyson Foods.  He claimed that his lead man made him do less desirable jobs than white employees and had allowed a co-worker to threaten him.

On May 4, 2007, Bishop wrote Kenneth Young regarding the number of attendance points given to him by Everett Ferguson.  Bishop claimed that he had called in that day over two hours before his shift began to report that he would not be at work.  He was told by Ferguson that he would receive three points because he did not call in three hours before his shift.  Bishop stated that the attendance policy only requires him to call in thirty (30) minutes before his shift

15

begins to receive one point.  Bishop claims that Ferguson assessed him the additional two points in retaliation of his filing his EEOC charge.   Later that day, Young questioned Ferguson about the incident.  Ferguson admitted that he did tell Bishop that he would receive three points but realized that he had misstated the company's attendance policy.  Ferguson agreed that Bishop should only receive one point.  Young met with Bishop and informed him that Ferguson had misstated the policy.  He informed Bishop that he would receive one attendance point for his absence, not three.

On May 7, 2007, Bishop wrote the EEOC to amend his discrimination charge again.  In this letter, Bishop claimed that Tyson was attempting to constructively discharge him because it was not taking effective action to stop the harassment against him.

On June 6, 2007, Bishop received a Right to Sue Letter from the EEOC.  Thereafter, on July 2, 2007, Bishop filed this discrimination action against Tyson Foods, Inc.

On July 16, 2007, Bishop claims that he found a Diet Coke that was left over from a barbeque hosted by Tyson for its catch crews.  He put the drink in the crew truck to drink later. When he went to get the Diet Coke, it was gone.  Bishop asked around and was told that Shane Sherrin had taken it.  Bishop became very upset and decided to go home.  Thereafter, he asked the night shop man if he could give him a ride back to the office.  The night shop man told him no because he was giving a ride to the man who waters the chickens on the live haul trucks. Bishop then asked Robert Walker, a live haul driver, for a ride.  Walker told him no because he was not allowed to carry catch crew members in his truck.  Finally, Bishop called Jeff Westfall, the Live Haul Manager, and asked him to come get him.  Westfall picked Bishop up and took him back to the office.  During the drive back to the office, Bishop told Westfall what happened.

16

He claimed that another live haul driver had given Eric Clardy, another African American crew member, a ride one hour earlier.  Westfall told Bishop that only the men who water the chickens are supposed to ride with the live haul drivers.  He said that he would talk to the other driver and make sure that did not happen again.  Westfall then told Bishop that any time he needed to leave early he could call him on his cell phone and he would come get him.

The next day, Westfall and Kenneth Young met with Bishop.  Bishop went over the events of the previous night and then reiterated his past grievances.  Young asked Bishop what he wanted done and Bishop said nothing.

On August 7, 2007, "E" crew had only one house to count because of a water leak at the plant.  Bishop states that it was Earl Hughle's turn to count cages because he had counted the previous day.  When they got to the house, Hughle "jumped on the left-hand side" leaving Bishop to work the right side and count cages.  John Dellinger told Hughle to switch with Bishop because he had counted the day before.  However, Everett Ferguson said he wanted Bishop to do the count.  When Bishop went outside to do the cage count, there was no catch hook or catch pen.  Because he could not pull the chickens out of the cage to count them, Bishop estimated the number of birds in the compartments.[14]  Thereafter, Ferguson asked Bishop if he had actually pulled the chickens to do the count.  Bishop told him no.  He also told Ferguson that he had counted cages the day before and felt like he was being "harassed."  Bishop then said that he wanted to go back to the office and talk to Jeff Westhall about the matter.  Ferguson allegedly told Bishop that he could talk to Kenneth Young, but not to Jeff Westfall.  Bishop then got into

---

[14] Bishop claims that he had overheard Everett Ferguson tell Brandon Deer to estimate the number of birds when he didn't have a catch hook or catch pen.

the crew cab and drove himself back to the office.  When Bishop arrived at the office, he told

Westfall what had happened.  Westfall told Bishop to go home and come back the next day to

talk to him and Kenneth Young about the matter.  Bishop returned the next day and tendered his

letter of resignation effective August 8, 2007.

On January 29, 2008, Bishop amended his original lawsuit against Tyson.  In his

Amended Complaint, Bishop alleges that Tyson discriminated against him on the basis of his

race in violation of Title VII of the Civil Rights Act of 1964 and 42 U.S.C. §1981.  Bishop

claims this discrimination was in the form of disparate treatment and a hostile work environment.

He also claims that his August 8, 2007 resignation was a constructive discharge.  The matter is

now before the Court on Tyson's Motion for Summary Judgment.

<u>STANDARD OF REVIEW</u>

The standard of review for summary judgment is well established.  The Federal Rules of

Civil Procedure provide that when a party moves for summary judgment;

> The judgment sought shall be rendered forthwith if he pleadings, dispositions,
> answers to interrogatories, and admissions on file, together with affidavits, if any,
> show that there is no genuine issue as to any material fact and that the moving
> party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c); *Krenik v. County of LeSueur,* 47 F.3d 953 (8th Cir. 1995).  The Supreme

Court has issued the following guidelines for trial courts to determine whether this standard has

been satisfied:

> The inquiry performed is the threshold inquiry of determining whether there is a
> need for trial–whether, in other words, there are genuine factual issues that properly
> can be resolved only by a finder of fact because they may reasonably be resolved
> in favor of either party.

*Anderson v. Liberty Lobby, Inc.,* 447 U.S.242, 250, 106 S.Ct. 2505, 2511(1986).  *See also*

18

*Agristor Leasong v. Farrow,* 826 F.2d 732 (8th Cir. 1987); *Niagara of Wisconsin Paper Corp. v. Paper Indus. Union-Management Pension Fund,* 800 F.2d 742, 746 (8th Cir. 1986).  A fact is material only when its resolution affects the outcome of a case.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248.  A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party.  *Id.*

The Court must view the evidence and the inferences that may be reasonably drawn from the evidence in the light most favorable to the nonmoving party.  *Enterprise Bank v. Magna Bank,* 92 F.3d 743, 747 (8th Cir. 1996).  The moving party bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.  *Id.*  The nonmoving party must then demonstrate the existence of specific facts in the record that creat a genuine issue for trial.  *Krenik v. County of LeSueur,* 47 F.3d at 957.  A party opposing a properly supported motion for summary judgment may not rest upon mere allegations or denials, but must set forth specific facts showing that there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 256.

<u>DISCUSSION</u>

In his Amended Complaint, Bishop alleges that Tyson Foods, Inc. discriminated against him on the basis of his race in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, *et seq.,* and 42 U.S.C. §1981.  In employment discrimination cases under Title VII and section 1981, the courts have long applied the familiar three-step burden shifting framework set forth in *McDonnell Douglas Corp. v. Green,* 41 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).  *See Putman v. Unity Health Sys.,* 348 F.3d 732, 735 n.2 (8th Cir. 2003) (applying *McDonnell Douglas* to section 1981 claims).  Under *McDonnell Douglas,* the plaintiff

19

must first establish a *prima facie* case of discrimination.  If the plaintiff is able to do this, the burden of production then shifts to the defendant to assert a legitimate non-discriminatory reason for the alleged discrimination.  If the defendant sets forth such a reason, the burden then shifts back to the plaintiff to establish that the asserted reason was merely a pretext for discrimination. Bishop claims that he was discriminated against on the basis of his race in the form of disparate treatment and a hostile work environment.  He also claims that his August 8, 2007 resignation was a constructive discharge.  The Court will review each of Bishop's claims in light of the above burden shifting framework.

### I. Hostile Work Environment Claim

Bishop claims that he was subjected to a hostile work environment during his tenure at Tyson.  In order to establish a racially hostile work environment claim, Bishop must show that: 1) he was a member of a protected group; 2) he was subjected to unwelcome harassment; 3) the harassment was because of his membership in the protected group; 4) the harassment affected a term, condition or privilege of his employment; and 5) Tyson knew or should have known about the harassment but failed to take prompt and effective remedial action.  *Diaz v. Swift-Eckrich, Inc.,* 318 F.3d 796, 800 (8th Cir. 2003) (citing *Carter v. Chrysler Corp.,* 173 F.3d 693, 700 (8th Cir. 1999)).  There is no doubt that Bishop can establish the first two elements of his *prima facie* case – he was a member of a protected group and he was subjected to unwelcome harassment. Therefore, the Court's analysis will focus on the three remaining elements – the harassment was motivated by his race, the harassment affected a term, condition or privilege of his employment and Tyson knew about the harassment but failed to take prompt and effective remedial action.

Harassment which is severe and pervasive is deemed to affect a term, condition, or

privilege of employment.  *Elmahdi v. Marriott Hotel Services, Inc.,* 339 F.3d 645, 652 (8th Cir.

2003) (citing *Faragher v. City of Boca Raton,* 524 U.S. 775, 786, 118 S.Ct. 2275, 141 L.Ed.2d

662 (1998).  The conduct must be severe "as it would be viewed objectively by a reasonable

person and as it was actually viewed subjectively by the victim."  *Id.* (quoting *Howard v. Burns*

*Bros., Inc.,* 149 F.3d 835, 840 (8th Cir. 1998)).  However, merely feeling offended does not

sufficiently affect the conditions of employment to support a claim.  *Id.* at 653 (citing *Harris v.*

*Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)).  Rather, to satisfy

the "high threshold of actionable harm," Bishop must show that his workplace was "permeated

with discrimination, intimidation, ridicule and insult."  *Id.* (citing  *Duncan v. Gen. Motors Corp.,*

300 F.3d 928, 934 (8th Cir. 2002) (quoting *Harris v. Forklift,* 510 U.S. at 21, 114 S.Ct. 367)).  In

determining whether sufficient evidence of a hostile work environment has been presented,

courts consider all the attendant circumstances, including the frequency of the discriminatory

conduct, its severity, whether it is physically threatening or humiliating or a mere offensive

utterance, and whether it unreasonably interfered with an employee's performance.  *Id.* at 652-53.

     *Racial Comments and Conduct by Co-Workers*

     Bishop claims that he was subjected to a hostile work environment when he was

subjected to inherently racial comments and conduct by his co-workers.  In response, Tyson

contends that Bishop can not show that the alleged harassment affected a term, condition or

privilege of his employment.  Therefore, he can not establish all the elements of his *prima facie*

case of hostile work environment and summary judgment is appropriate.

     In support of his claim, Bishop points to two Caucasian crew members, Matthew

Woodall and Brandon Deer, who used the "N"  word in his presence.  The first offense occurred

in late 2005 when Woodall used this word in reference to himself.  Bishop did not report it.

About a month later, Bishop overhead Woodall use the "N" word again in reference to himself.

Thereafter, on January 27, 2006, Bishop reported the two incidents to Kenneth Young and Don

Mason.  As a result of the allegations, an investigation was conducted.  During the investigation,

Woodall admitted to Mason that he had used the word but stated that it was not directed to

anyone.  He was told that such language would not be tolerated and was given a written

disciplinary warning for the use of inappropriate and offensive language.  Woodall never again

used the "N" word in Bishop's presence.

        The second offense happened in July 2006, shortly after Brandon Deer joined the "E"

crew.  Deer used the phrase "nigger-rig" in Bishop's presence.  Bishop admits that he did not

report the incident at the time it happened, but another crew member did.  Thereafter, John

Dellinger, the lead man, spoke to Bishop and told him that he had talked to Deer about his

inappropriate comment.  Deer then apologized to Bishop.  Later, on August 4, 2006, Bishop filed

a formal complaint with Benjamin Timmons about the incident.  As a result on this complaint, an

investigation was conducted.  It was determined that Deer did use the "N" word.  He was given a

written disciplinary warning for using inappropriate and offensive language.  Deer never again

used the "N" word in Bishop's presence.

        Three racial slurs, not directed at Bishop, over a two year period are not severe or

pervasive enough to create a hostile work environment.  *Woodland v. Joseph T. Ryerson & Son,*

*Inc.,* 302 F.3d 839, 844 (8th Cir. 2002).  While offensive, these comments would not be viewed

by a reasonable person as hostile.  *See Singletary v. Missouri Dept. of Corrections,* 423 F.3d 886,

893 (8th Cir. 2005).  Such offhand comments and isolated incidents will not amount to a

discriminatory change in the terms and conditions of employment.  *Wallins v. Minnesota Dept. of Corrections,* 153 F.3d 681, 688 (8th Cir. 1998).  They do not constitute a "steady barrage of opprobrious racial comment."  *Elmahdi,* 339 F.3d at 653 (quoting *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1257 (8th Cir. 1981)).  Thus, these three incidents are insufficient to have affected a term, condition, or privilege of Bishop's employment.  Also, it is apparent that Tyson took prompt and effective remedial action after Bishop reported the incidents.  This conduct is insufficient to support Bishop's claims of a racially hostile work environment.

Next, Bishop claims that on one occasion in September 2005, two Caucasian truck drivers, Lee Wofford and Robert Walker, showed Bishop and Ronnell Riggins, another African American crew member, a string that was tied into a hanging noose. Riggins allegedly asked Walker where he learned to tie the noose.  Before Walker could answer, Wofford said all rednecks can tie nooses.  Wofford then showed them his tattoo of a wizard and said it was a "Klan" tattoo.  The next day Bishop reported the incident to Benjamin Timmons.[15]  After this meeting, Timmons spoke to Everett Ferguson, "E" crew's supervisor, and Don Mason, the Live Haul Manager.  Timmons asked Ferguson and Mason to look into the matter.  Thereafter, Mason talked to Lee Wofford about the tattoo and the "Klan" remark.  Mason then met with the entire crew and told them not to use the terms "redneck" or "Klan" anymore because they were offensive to Bishop.  There is no evidence that anyone ever tied a hanging noose or mentioned the "Klan" again.  In fact, Bishop admits that after his meeting with Timmons in late September or early October 2005, he never saw a hanging noose or heard the  "Klan" or the "KKK"

---

[15] Originally, Bishop went to the office to report this incident to Paul Britt or Kenneth Young.  Because both men were unavailable, he report it to Benjamin Timmons.

23

mentioned.

In determining whether the alleged harassment affected the term, condition or privilege of employment, the courts look at the frequency of the discriminatory conduct, whether it is physically threatening and whether it was aimed directly toward the plaintiff.  Here, Bishop is complaining of an isolated incident that was not specifically directed toward him.  There is no evidence that Bishop felt physically threatened by the hanging noose or Wofford's alleged "Klan" comment.  This isolated incident is not enough to be a discriminatory change in the terms or conditions of Bishop's employment.  *Wallin,* 153 F.3d at 688.  There is also evidence that Tyson took prompt and effective remedial action in regard to Bishop's complaint.[16]  Therefore, the conduct of which Bishop complains is insufficient to support his claim of a racially hostile work environment.

Bishop next claims that several Caucasian crew member called themselves "rednecks" in his presence.  In support of this claim, Bishop points to an incident when Ronnell Riggins handed John Dellinger his pocketknife and Dellinger said "all of us 'rednecks' in the chicken houses, Big Orange [Ronnell Riggins] is the one that had the knife."  Bishop also points to the fact that Dellinger sometimes wore a tee shirt that said something about rednecks liking to hunt and fish.

---

[16] Bishop claims that Tyson did not investigate this incident until February 28, 2006, six months after he made the complaint.  However, this is not supported by the evidence before the Court.  It is true Tyson conducted an investigation in February 2006 and questioned all crew members regarding the alleged incident.  However, this was Tyson's second investigation into this complaint.  The first took place in October or November 2005, after Bishop met with Benjamin Timmons and told him about the incident.  In this initial investigation, Don Mason spoke with Lee Wofford and then met with the entire crew.  The crew was told not to use the terms "redneck" or "Klan" again.  Bishop admits that after his meeting with Timmons in late September or early October 2005, he never saw another hanging noose or heard anyone mention the "Klan."

24

Bishop found this conduct offensive.  Bishop claims that he complained about these "redneck" comments in September or October 2005.  As a result of this complaint, Don Mason met with the crew members and told them not to make "redneck" comments anymore.  Bishop claims that the comments did not stop.  Therefore, in January 2006, he complained about the comments again. This time he complained to Kenneth Young.  Bishop admits that the "redneck" comments stopped at some point thereafter, but he is not sure when.

There is nothing inherently racial about these "redneck" comments.  There is also no evidence regarding their frequency.[17]  Again, such offhand comments and isolated incidents are not severe and pervasive enough to be deemed a discriminatory change in the terms or conditions of Bishop's employment.  Thus, this conduct is not sufficient to support Bishop's claim of a racially hostile work environment.

Finally, Bishop claims that he was subjected to a hostile work environment when his co-workers wore clothing depicting the Confederate flag.  Bishop claims that on two occasions, once in October 2005 and once in December 2005, five Caucasian crew member wore bandannas or headbands depicting the Confederate flag.  Bishop claims that he complained to Benjamin Timmons after each incident.  After he complained in December 2005, the group as a whole never again wore the bandannas or headbands.[18]  Bishop claims that after December 2005, John Dellinger and Shane Sherrin would occasionally wear a Confederate flag bandanna to work.[19]  In

---

[17] The comments appear to be sporadic at best.

[18] Although there is no evidence whether Tyson took any remedial action to stop this behavior, the evidence is clear that after December 2005, the group never wore the bandannas or headbands again.

[19] There is no evidence of when or how often this conduct took place.

August 2005, he complained of the conduct in a meeting with Kenneth Young and Don Mason. Bishop claims that Young responded to his complaint by saying "Black people wear offensive clothing as well, like those N.A.A.C.P. tee shirts."[20]  Bishop claims that this statement shows that Young wasn't going to take any action to end this conduct.  However, after this August meeting, neither Dellinger nor Sherrin ever wore the Confederate flag bandannas again.

Wearing a depiction of the Confederate flag is clearly discriminatory and offensive. However, while offensive, this conduct would not be viewed by a reasonable person as hostile. For such a display to be sufficiently severe to create a hostile work environment it must be frequent and permeate the work place.  This is not the case.  Here, five crew members wore headbands or bandannas depicting the Confederate flag on two occasions.  Bishop complained about the conduct and it stopped.  Two individual crew members wore Confederate flag bandannas occasionally.  Bishop complained and it stopped.  This isolated conduct was not continuous throughout Bishop's two year tenure at Tyson.  It did not permeate the work place. This conduct was not sufficiently severe or pervasive enough to alter the conditions of Bishop's employment.  Thus, it is not sufficient to support his claim of a racially hostile work environment.

The racial comments and conduct of which Bishop complains are not what a reasonable person would consider harassment.  Such conduct was sporadic and did not permeate the work place.  It was not severe or pervasive enough to amount to a discriminatory change in the terms and conditions of Bishop's employment.  It is also apparent that after Bishop complained, Tyson took remedial action and the conduct stopped.  Thus, Bishop has failed to establish a *prima facie*

---

[20] Young denies making this statement regarding N.A.A.C.P. tee shirts.

case of hostile work environment in connection with the inherently racial comments and conduct

by his co-workers.

### *Other Conduct by Co-Workers*

Bishop claims that he was subjected to a hostile work environment when he was

subjected to other conduct by his co-workers that was not inherently racial. In response, Tyson

contends that Bishop can not show that the alleged harassment was motivated by Bishop's race

or that it affected a term, condition or privilege of his employment. Therefore, he can not

establish his *prima facie* case of hostile work environment in regard to these claims and summary

judgment is appropriate.

In support of his claim, Bishop points to various incidents which he claims were racially

motivated discrimination. These claims include: 1) Bishop missing his lunch break 3 or 4 times

and his time being docked; 2) someone throwing a chicken at Bishop; 3) someone stealing

Bishop's tuna Subway sandwich; 4) Everett Ferguson accusing Bishop of overloading a cage

with 31 chickens; 5) Bishop receiving attendance points when he missed work to report work

related problems on three occasions; 6) John Dellinger yelling, "turn the damn thing off" at

Bishop; 7) Bishop being denied overtime work washing catch machines on one Saturday; 8)

Bishop being required to count cages more than other crew members; 9) Bishop being threatened

by Earl Hughle, an African American co-worker, on one occasion; 10) Everett Ferguson

interrupting Bishop's lunch and making him go rehang some curtains in a chicken house; 11)

Everett Ferguson not answering Bishop's question about the job schedule on one occasion;

12) Everett Ferguson being rude to Bishop by not giving him a pen to sign an attendance form on

one occasion; 13) Everett Ferguson not giving Bishop an aspirin on one occasion; 14) Everett

Ferguson jumping on Bishop when he hung some curtains too high; 15) Everett Ferguson telling Bishop that he had to get approval from a supervisor before he could turn in his vacation request; 16) Everett Ferguson assessing Bishop too many attendance points for missing work on one occasion; 17) Shane Sherrin taking a Diet Coke that Bishop found and was saving for himself; 18) Bishop being refused a ride to the office by a night shop man and a live haul driver on one occasion; and 19) Bishop having to count cages two days in a row.

The discrimination laws are not a general civility code.  There is no evidence that any of the numerous incidents of which Bishop complains were motivated by or based upon Bishop's race.  *See Schoffstall v. Henderson,* 223 F.3d 818, 826 (8th Cir. 2000).  Without such evidence, Bishop may only speculate that the alleged misconduct was racially motivated.  Such speculation is not sufficient to avoid summary judgment.  *Wilson v. International Business Machines Corp.,* 62 F.3d 237 (8th Cir. 1995).  It is also apparent that Tyson took prompt and effective remedial action each time Bishop complained.  Thereafter, the alleged misconduct of which Bishop complained stopped [with the exception of counting cages two days in a row and it was determined that *all* crew members had to count cages two days in a row from time to time].  Thus, Bishop has failed to establish his *prima facie* case of hostile work environment in connection with the above conduct by his co-workers.

Over the two years that Bishop worked at Tyson he lodged numerous complaints regarding alleged discrimination.  In viewing this alleged conduct as a whole, it is not sufficient to create a hostile work environment.  The alleged misconduct is either not severe or pervasive enough to have affected a term or condition of Bishop's employment or was not motivated by or based upon his race.  Thus, Bishop has failed to establish his *prima facie* case in regard to his

28

claim of a hostile work environment.  Accordingly, the Court finds that this claim must fail as a matter of law.

### II. Disparate Treatment Claim

Bishop claims that he was subjected to disparate treatment based upon his race during his tenure at Tyson.  In order to establish a *prima facie* case of disparate treatment, Bishop must show that: 1) he was a member of a protected class; 2) he was meeting his employer's legitimate job expectations; 3) he was subjected to an adverse employment action; and 4) similarly situated employees outside the class were treated differently.  *Philip v. Ford Motor Co.,* 413 F.3d 766, 768 (8th Cir. 2005).  There is no doubt that Bishop can establish the first two elements of his *prima facie* case – he was a member of a protected class and he was meeting his employer's legitimate job expectations.  Therefore, the Court's analysis will focus on the last two elements – whether Bishop was subjected to an adverse employment action and if similarly situated employees outside the class were treated differently.

In order for conduct to constitute an adverse employment action there must be a tangible change in working conditions that produces a material employment disadvantage.  Therefore, to be actionable, an employment action must be one that causes a material change in the terms or conditions of employment.  *Tipler v. Douglas County, Nebraska,* 2006 WL 1314328, *10 (D.Neb. May 11, 2006) (citing *Ledergerber v. Stangler,* 122 F.3d 1142, 1144 (8th Cir. 1997)).  Termination, reduction in pay or benefits, and changes in employment that significantly affect an employee's future career prospects meet this standard, but minor changes in working conditions that merely inconvenience an employee or alter an employee's work responsibilities do not.  *Sallie v. University of Minn.,* 408 F.3d 470, 476 (8th Cir. 2005).

29

Bishop claims that during his tenure at Tyson he was subjected to disparate treatment in three instances.  The first instance involves Bishop's allegation that his recorded work time was docked 30 minutes three or four times when he did not take his lunch break.  Tyson contends this conduct did not amount to an adverse employment action because chicken catchers are not paid on an hourly basis but rather on the number of birds caught.  It also claims that Bishop has not shown that his pay was actually reduced.  The Court agrees.  There is no evidence that Bishop suffered an adverse employment action when his work time was docked.  There is also no evidence that similarly situated Caucasian employees were not also docked time when they missed their lunch breaks – that they were treated more favorably than Bishop.  Therefore, Bishop has failed to establish the third and fourth elements of his *prima facie* case of disparate treatment in regard to his work time being docked.  Accordingly, the Court finds that this claim must fail as a matter of law.

Next, Bishop claims that he suffered disparate treatment when he was denied the opportunity to earn overtime pay by washing the catch machines on one Saturday.  Being denied overtime is clearly an adverse employment action.  However, there is no evidence that similarly situated Caucasian employees were not also denied the same opportunity to earn overtime pay – that they were treated more favorably than Bishop.  Thus, Bishop has failed to establish the fourth element of his *prima facie* case of disparate treatment in regard to his being denied overtime.  Accordingly, the Court finds that this claim must fail as a matter of law.

Finally, Bishop claims that he suffered disparate treatment by having to count cages two or more days in a row.  Counting cages is not an adverse employment action.  It does not cause a material change in the term or conditions of Bishop's employment or produce a material

30

employment disadvantage.  Bishop simply found it to be unpalatable.  It is also apparent that all crew members often times had to count cages for two days in row.  There is no evidence that similarly situated Caucasian employees were treated more favorably than Bishop.  Thus, Bishop has failed to establish the third and fourth element of his *prima facie* case of disparate treatment in regard to his counting cages.  Accordingly, the Court finds that this claim must fail as a matter of law.

### III.  Constructive Discharge Claim

Bishop claims that he was constructively discharged on August 7, 2007.  In order to establish a claim for constructive discharge, Bishop must show: 1) that a reasonable person in his situation would find the working conditions intolerable; and 2) the employer intended to force him to quit.  *Anda v. Wickes Furniture Co.,* 517 F.3d 526, 534 (8th Cir. 2008).  An employee must also allow the employer a reasonable opportunity to correct the intolerable condition before he resigns.  *Turner v. Honeywell Fed. Mfg. & Techs., LLC,* 336 F.3d 716, 724 (8th Cir. 2003).

In this case, Bishop quit because he had to count cages two days in a row.  No reasonable person would find this to be so intolerable that they had no choice but to quit.  He also claims that he had to quit because of Tyson's non-action in regard to his numerous complaints of discrimination.  However, the evidence shows that Tyson took prompt remedial action to stop the alleged harassment each time Bishop complained.  The alleged mistreatment had all stopped with the exception of his having to occasionally count cages two days in a row.  Bishop's working conditions were not intolerable.  Also, Bishop did not give Tyson time to correct the alleged intolerable condition.  When he came into the office on August 8, 2007, he would not talk to Jeff Westfall and Kenneth Young about the situation.  He simply turned in his resignation.  Thus,

31

Bishop's constructive discharge must fail as a matter of law.

<u>CONCLUSION</u>

For the reasons discussed herein and above, the Court finds that Defendant Tyson Foods, Inc.'s Motion for Summary Judgment should be and hereby is **granted**.  A judgment of even date, consistent with this Opinion, will be issued.

IT IS SO ORDERED, this 14th day of September, 2009.

        /s/Harry F. Barnes     
      Hon. Harry F. Barnes
      United States District Judge